Nina Perales, TX SBN: 24005046
Carlos Becerra, IL SBN: 6285722
Diego Bernal, TX SBN: 24048350
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Ph: (210) 224-5476
nperales@maldef.org
cbecerra@maldef.org
dbernal@maldef.org

Daniel R. Ortega, Jr., SBN: 005015
ROUSH, MCCRACKEN, GUERRERO,
MILLER & ORTEGA
650 North Third Avenue
Phoenix, Arizona 85003
Ph: (602) 253-3554
danny@rmgmoinjurylaw.com

Karl J. Sandstrom
PERKINS COIE, LLP
607 Fourteenth Street, N.W., Suite 800
Washington, D.C. 20005
Ph:(202)434-1639
ksansdstrom@perkinscoie.com

Attorneys for Gonzalez Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria M. Gonzalez, et al., | No. CV-06-1268-PHX-ROS(Lead) |
| | No. CV-06-1362-PCT-JAT(Cons.) |
| Plaintiffs, | No. CV-06-1575-PHX-EHC(Cons.) |
| | |
| vs. | GONZALEZ PLAINTIFFS' |
| | RESPONSE TO SEPARATE |
| State of Arizona, et al, | STATEMENT OF FACTS IN |
| | SUPPORT OF MOTION FOR |
| Defendants. | PARTIAL SUMMARY JUDGMENT |
| | BY DEFENDANTS STATE OF |
| | ARIZONA AND THE ARIZONA |
| | SECRETARY OF STATE |
| | |
| | (Assigned to the |
| | Honorable Roslyn O. Silver) |

Pursuant to Fed R. Civ. P. 56 and Local Civil Rule 56.1, Plaintiffs Maria M. Gonzalez, Jesus M. Gonzalez, Bernie Abeytia, Luciano Valencia, Debbie Lopez, Southwest Voter Registration Education Project, Valle Del Sol, Friendly House, Chicanos Por La Causa, Inc., and Arizona Hispanic Community Forum ("Gonzalez Plaintiffs") set forth the following statements of issues in opposition to Defendants Separate Statement of Facts in Support of Motion for Partial Summary Judgment by Defendants State of Arizona and the Arizona Secretary of State [Dkt. No. 282-8].

## **PREFACE**

The following Response to the Separate Statement of Fact in Support of Motion for Partial Summary Judgment by Defendants State of Arizona and the Arizona Secretary of State ("Response') is divided into three parts. Part I is a response to items in Defendants' statement of facts. Part II contains the Gonzalez Plaintiffs Statement of Facts pertinent procedural and substantive aspects of the National Voter Registration Act of 1993 ("NVRA"), including the legislative history. Part III focuses on facts relating to the implementation of the "Arizona Taxpayer and Citizen Protection Act" (which appeared on the ballot in November 2004 as Proposition 200 and is referred to herein as "Proposition 200" or "Prop 200").

**I.    Response to Items in Defendants' "Separate Statement of Facts in Support of Motion for Partial Summary Judgment by Defendants State of Arizona and the Arizona Secretary of State"**

¶ 1.    On November 2, 2004, Arizona voters adopted by ballot initiative Proposition 200 ("Prop 200") [Decl. of Counsel in Supp. of Mot. For Partial Summary Judgment by Defs. State of Arizona and the Arizona Secretary of State ("Counsel Decl.") Tab 1 (Letter dated December 9, 2004, from Jessica Funkhouser to Joseph Rich, and exhibits A and B thereto)]

**RESPONSE:** Not disputed.

¶ 2.    Section 3, 4 and 5 of Prop 200 amended Arizona's voting laws in two substantive ways: (1) applicants to register to vote were required to submit proof of U.S. citizenship; and (2) voters who choose to vote in-person at the polls on election day (as opposed to early voters) would be required to present identification [Counsel Decl. Tab 1 ex. A (Proposition 200 Official title, An Initiative Measure), at pp. 1-3)]

**RESPONSE:** Disputed to the extent that former A.R.S. § 16-152 already required voter registration applicants to provide proof of U.S. citizenship in the form of signing an attestations of citizenship and acknowledging that executing a false registration form was a class 6 felony. See A.R.S. § 16-152, Statutory Notes.

¶ 3.    On December 9, 2004, the Arizona Attorney General submitted to the U.S. Department of Justice ("DOJ") a request for preclearance of Sections 3, 4 and 5 of Prop 200. Dkt. # 282-8, attachment 1]

**RESPONSE:** Disputed to the extent that the preclearance request did not notify the DOJ that Arizona would change its NVRA procedures and failed to notify

DOJ that Arizona would condition acceptance of the federal mail voter registration application upon submission by the applicant of documentary proof of citizenship pursuant to Prop 200. *Id.*

¶ 4.    The request for preclearance expressly stated, among other things, that Prop 200's amendments would "require applicants registering to vote to provide evidence of United States citizenship with the application." [Counsel Decl. tab 1 (Letter dated December 9, 2004 from Jessica Funkhouser to Joseph Rich at p. 1)]

**RESPONSE:** Disputed to the extent that the preclearance request did not notify the DOJ that Arizona would change its NVRA procedures and failed to notify DOJ that Arizona would condition acceptance of the federal mail voter registration application upon submission by the applicant of documentary proof of citizenship pursuant to Prop 200. [Counsel Decl. Tab 1 (Letter dated December 9, 2004 from Jessica Funkhouser to Joseph Rich)]

¶ 5.    The preclearance request letter also included an "Analysis by Legislative Council" of Prop 200's amendments to Arizona's voting laws, which analysis expressly stated that the amendments "would required that evidence of United States citizenship be presented by every person to register to vote," and which set forth the forms of identification specified by Prop 200 that would constitute satisfactory evidence of U.S. citizenship. [Counsel Decl. Tab 1 (Letter dated December 9, 2004 from Jessica Funkhouser to Joseph Rich at p. 2)]

**RESPONSE:**  Disputed to the extent that the preclearance request did not notify the DOJ that Arizona would change its NVRA procedures and failed to notify

DOJ that Arizona would condition acceptance of the federal mail voter registration application upon submission by the applicant of documentary proof of citizenship pursuant to Prop 200. [Counsel Decl. Tab 1 (Letter dated December 9, 2004 from Jessica Funkhouser to Joseph Rich)]

¶ 6.    The submission package to the DOJ comprised many pages and attached numerous exhibits of information about Prop 200, including copies of the initiative, the laws to be amended by Prop 200, and articles and other public information relating to its passage. [Counsel Decl. Tab 1 (Letter dated December 9, 2004 from Jessica Funkhouser to Joseph Rich, (referencing attached exhibits), and exhibits A and B thereto)]

**RESPONSE:** Disputed to the extent that the Declaration of Counsel in Support of Motion for Partial Summary Judgment by Defendants State of Arizona and the Arizona Secretary of State failed to include any "articles and other public information." Also, disputed to the extent that DOJ neither notified nor included for DOJ review A.R.S. § 16-121.01 which: set out the "requirements for proper registration" in Arizona prior to the passage of Proposition 200; paralleled the voter registration requirements of the NVRA, thus enabling Arizona to use its own state form to register voters in federal elections pursuant to the NVRA; and which the State now contends was materially altered by Proposition 200's documentary proof of citizenship requirement. Also, disputed to the extent that the preclearance request did not notify DOJ that Arizona would change its NVRA procedures and did not notify DOJ that Arizona would condition acceptance of the federal mail voter registration application upon submission by the applicant of documentary proof of citizenship pursuant to Prop

4

200.    [Counsel Decl. Tab 1 (Letter dated December 9, 2004 from Jessica Funkhouser to Joseph Rich, (referencing attached exhibits), and exhibits A and B thereto)]

¶ 7.    The DOJ precleared (*i.e.,* the voting-related amendments) Sections 3, 4 and Section 5 of Prop 200 on January 24, 2005. [Counsel Decl. Tab 2 (Letter dated January 24, 2005 from Joseph Rich to Jessica Funkhouse)]

**RESPONSE:** Disputed. DOJ did not preclear any implementation of Prop 200 that would change Arizona's NVRA procedures and did not preclear any change by Arizona that would condition acceptance of the federal mail voter registration application upon submission of documentary proof of citizenship pursuant to Prop 200.

¶ 8.    Since the inception of the National Voter Registration Act in 1995, Arizona has used and accepted for voter registration the Federal Mail Voter Registration Form (Federal Form), which was developed by the U.S. Election Assistance Commission ("EAC"). [Counsel Decl. Tab 3 (Affidavit of Joseph Kanefield dated May 31, 2006 ("Kanefield Aff.") ¶ 2]

**RESPONSE:** Disputed. Defendants have not used and accepted the Federal Mail Voter Registration Form (Federal Form) which was developed by the U.S. Election Assistance Commission ("EAC"). First, the Federal Form was developed by the Federal Election Commission and not the EAC prior to 2002. Second, Defendants do not make the Federal Form available to the public. Third, since Proposition 200 was implemented in 2005, Defendants have rejected properly-completed Federal Forms that were not accompanied by documentary proof of citizenship as defined in A.R.S. § 16-166(F). [[Counsel Decl. Tab 3 (Affidavit of Joseph Kanefield dated May 31, 2006

("Kanefield Aff.") ¶ 3; Kanefiled depo. 147:9-150:16.; Perales Decl. Ex. E; Rodriguez depo. 83:13-84:6; Osborne depo. p.42:24 – 43:17]

¶ 9.    Following the implementation of Prop 200, Arizona has continued to accept both the Federal Form and Arizona's form for voter registration purposed, although the State requires submission of proof of U.S. citizenship along with whichever application form the registrant submits. [Counsel Decl. Tab 3 (Kanefield Aff.) ¶ 2]

**RESPONSE:**  Disputed. Defendants reject properly-completed Federal Forms that are not accompanied by documentary proof of citizenship as defined in A.R.S. § 16-166(F).  [Counsel Decl. Tab 3 (Affidavit of Joseph Kanefield dated May 31, 2006 ("Kanefield Aff.") ¶ 3]

¶ 10.    The Arizona Secretary of State makes the Federal Form available to anyone who requests it, and the form is available for downloading and printing on the EAC's website. [Counsel Decl. Tab 3 (Kanefield Aff.) ¶ 4]

**RESPONSE:**  Disputed.  Defendant Arizona Secretary of State does not make the Federal Form available to the public unless an individual makes a specific request for the Federal Form.  The Secretary of State only displays and makes available on the counter the Arizona State registration form. [Kanefield Depo. 147:9-150:16.]

¶ 11.    Most individuals who are eligible to register to vote already possess a driver's license or nonoperating identification card, and thus do not require any other identification to vote. [Counsel Decl. Tab 4 (Deposition of Ronald Anthony Sissons dated August 11, 2006), at 77:15-21)]

6

**RESPONSE:** Disputed. The statement assumes incorrectly that all AZ driver's licenses and nonoperating identification cards constitute sufficient proof of citizenship under Proposition 200. According to the Arizona Department of Transportation, as of August 3, 2006, 576,040 Arizonans held drivers' licenses or state identification cards that were issued before 1996. None of these more than one-half million people can use their drivers' licenses or state identification cards to register to vote because Proposition 200 excludes these documents from the list of acceptable forms of proof of citizenship. All of these more than half-million people who are eligible to register to vote must obtain another document proving their citizenship in order to register. [Exhibit 59 to ITCA Plaintiffs' Reply in Support of Preliminary Injunction]

¶ 12. Many counties send official election mail and voter registration cards and inform voters that they may use those items as identification at the polls. Those items are free. [Counsel Decl. Tab 5 (County Defendant Responses to Requests for Production); Tab 6 (Deposition of Karen Osborne, dated July 31, 2006), at 60:22-62:6; Tab 7 (Deposition of F. Ann Rodriguez, dated August 2, 2006), at 84:7-12 and 85:25-86:4; Tab 8 (Deposition of Kelly Dastrup, dated August 1, 2006), at 10:7-14 and 11:22-13:1]

**RESPONSE:** Disputed to the extent that the term "many" is unquantifiable. Moreover, sent election mail and voter registration cards are not listed as acceptable identification at the polling place. [Exhibit 3 from pi hearing] In

addition, there is no evidence in the record that counties who may have sent election mail and voter registration cards will do so in the future.

## **GONZALEZ PLAINTIFFS STATEMENT OF FACTS**

## **II.    THE NATIONAL VOTER REGISTRATION ACT OF 1993**

1.    Section 9 of the NVRA requires the Federal Election Commission (FEC) to develop a national mail voter registration form ("form") for elections to federal office. 42 U.S.C. § 1973gg-1 *et seq*. The FEC was charged with creating a form that complied with the NVRA and contained all elements necessary for states to determine voter qualification and administer voter registration. 42 U.S.C. § 1973gg-7(b)(1).

2.    Congress found that mail registration was a particularly effective means of voter registration, and emphasized its importance by granting authority to create a uniform, national voter registration form with a federal government agency. *See* 42 U.S.C § 1793gg-7.

3.    When President Clinton signed the NVRA into law, he noted that uniform national "registration for Federal election[s] will become as accessible as possible, while the integrity of the electoral process is clearly preserved." Remarks on Signing the National Voter Registration Act of 1993, 29 Weekly Comp. Pres. Doc. 915 (May 20, 1993).

4.    On February 23, 1993, Congress received a report from the Senate Committee on Rules and Administration regarding the National Voter registration Act. The Committee reported to Congress that "[t]he purposes of the [NVRA] are to establish procedures which will increase registration of eligible citizens in elections for

Federal office; to make it possible for Federal, State, and local governments to implement the Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office; to protect the integrity of the political process; and to assure an accurate and current voter registration roll." S. Rep. 103-6, at 1 (1993).

5.    The Senate Committee also explained that to "increase registration of eligible citizens, [the NVRA] would require States that require registration to vote in elections for Federal office, to permit voter registration by the following means, in addition to any other method provided by State law: (a) by application simultaneous with an application for a motor vehicle drivers license so-called 'motor-voter' registration; (b) by use of a uniform mail application; and (c) by application in person at an agency designated to process registration applications in each State." S. Rep. 103-6, at 1 (1993).

6.    The Senate Committee reported that the NVRA was designed to "provide uniform national voter registration procedures for Federal elections and thereby further the procedural reform intended by the Voting Rights Act," by alleviating discriminatory voter registration practices employed by some states. S. Rep. 103-6, at 2 (1993).

7.    The Committee noted that "[i]t must be remembered that that the purpose of [the United States'] election process is not to test the fortitude of the voter, but to discern the will of the majority." S. Rep. 103-6, at 2 (1993).

8.    The Senate Committee addressed Congress' ability to pass the NVRA: "Congress has the power to regulate federal elections, including the establishment of

9

voter registration procedures for Presidential and congressional elections." S. Rep. 103-6, at 3 (1993).

9.     The Committee's report also noted, "Congress' power has been clearly established under the Times, Places, and Manner Clause and the Necessary and Proper Clause of the Constitution. These provisions, as interpreted by the Supreme Court, belie assertions by those who argue that the States have exclusive authority to regulate the manner in which Federal elections are conducted." S. Rep. 103-6, at 3 (1993).

10.     The Committee's report states the NVRA is an appropriate use of congressional power. S. Rep. 103-6, at 3 (1993).

11.     The Senate Committee reported that uniform mail registration is one of the purposes and objectives of the NVRA. S. Rep. 103-6, at 7 (1993).

12.     The Committee believed  the NVRA's requirements that the registrant produce proof of their date of birth and attest to their age and citizenship, "together with the criminal sections of the bill…provides sufficient safeguards to prevent noncitizens from registering to vote." S. Rep. 103-6, at 7-9 (1993).

13.     The Senate Committee on Rules and Administration cited a 1984 study by the Congressional Research Service that found that States using mail registration procedures "had no more fraud with post card registration than with in-person registration." S. Rep. 103-6, at 8 (1993).

14.     The Senate Committee also reported that then-Governor of Oregon, Barbara Roberts, testified that the state's mail registration system, instituted in 1975, had "not experienced any cases of fraud or fraudulent voting with mail registration…

[and] despite Oregon's large migrant worker population, there [had] not been any indication of non-citizens registering to vote." S. Rep. 103-6, at 8 (1993).

15.     The Committee's report explains that criminal penalties under the NVRA for "willful offenses, including the submission of voter registration applications containing materially false information" are greater and more comprehensive than those in the Voting Rights Act. S. Rep. 103-6, at 7 (1993).

16.     The Senate Committee reported that a "registrant is permitted to use the Federal form or the appropriate State form and the States would be required to accept either form." S. Rep. 103-6, at 7 (1993).

17.     The Senate Committee stated in their report that "[m]ail registration is convenient for the voter, for registration drive organizers and for voter registrars as well." S. Rep. 103-6, at 8 (1993).

18.     With regard to agency-based registration program, the Senate Committee stated that the role of the program "is to provide forms to applicants and receive completed voter applications for transmittal to the appropriate State voting registration official." S. Rep. 103-6, at 11 (1993).

19.     The Senate Committee found that the mail registration application form "may not include information any requirement for notarization *or other formal authentication*, such as witnessing." S. Rep. 103-6, at 16 (1993).

20.     The Senate Committee found that a uniform mail registration application "will permit voter registration drives through a regional or national mailing, or for more

than one State at a central location, such as a city where persons from a number of neighboring States work, shop or attend events." S. Rep. 103-6, at 17 (1993).

21.     The Committee explained that the NVRA requires the chief State election official to make the mail registration form available to governmental and private entities, "with a particular emphasis on making such forms available to organized voter registration programs." S. Rep. 103-6, at 17 (1993).

22.     In its report, the Senate Committee stated, "[b]road dissemination of mail application forms, when coupled with the other procedures of [the NVRA] should reach most persons eligible to register to vote, and is, therefore, a key element of the voter outreach feature of the bill." S. Rep. 103-6, at 17 (1993).

23.     The Senate Committee found that the application procedures employed to prevent fraud, such as including setting forth the requirements to vote (including age and citizenship) and an attestation to be signed by the applicant under penalty of perjury were sufficient. S. Rep. 103-6, at 17 (1993).

24.     The Senate Committee noted that "[i]n those States that develop their own mail voter registration application, an applicant may use, and the State must accept, either the national form developed by the FEC or the State's own form." S. Rep. 103-6, at 17 (1993).

25.     The Senate Committee reported that the Federal Election Commission was responsible for developing regulations necessary to implement the NVRAS. Rep. 103-6, at 22 (1993).

26. The Senate Committee found that the FEC was also responsible for working with the Chief Election Officer of each State "to develop a mail voter registration application form for Federal elections[.]" S. Rep. 103-6, at 22 (1993).

27. The Committee found that the NVRA mandated that the mail registration form developed by the FEC "may only require such identifying information (including the signature of the applicant) and other information (including data relating to previous registrations) as is necessary to enable the appropriate State election official to assess the applicants eligibility. [It] must also include a statement that specifies each eligibility requirement (including citizenship); contain an attestation that the applicant meets such requirements, and require the signature of the applicant under penalty of perjury... [and] may not include any requirement for notarization or other formal authentication, i.e., a witness requirement." S. Rep. 103-6, at 22-23 (1993).

28. The Senate Committee found that the NVRA would supersede state laws that conflict with the bill, explaining the states would have to change their laws to be consistent with the NVRA, "[o]therwise, those states would have to maintain separate registration rolls and conduct federal elections separately from other elections." S. Rep. 103-6, at 27 (1993).

29. The Congressional Record for the Conference Report on the NVRA demonstrates the intent of Congress to establish a "uniform standard" for national voter registration, "a uniform set of procedures that will allow individuals to exercise the franchise to vote, whether they live in Iowa, or Minnesota, or Illinois, or Alaska, or Florida, or Texas, or California, or wherever in [the] United States they may reside."

*See, e.g.,* 139 Cong. Rec. S 5677 (statement of Sen. Wellstone); *id* (statement of Sen. Moseley-Braun).

30.     Senator Wendell Ford of Kentucky addressed the fear of rampant voter fraud as a result of the NVRA by noting that Congress has not heard the same "fears coming from States who now have basically the same thing as [the NVRA]." 138 Cong. Rep. S. 5677, 5682 (statement of Sen. Ford).

31.     During the floor debate over the NVRA in the House of Representatives, Representative Allen Swift of Washington stated that fears about non-citizens gaining the ability to vote because of the NVRA were unfounded and that citizenship would remain a requirement to vote. *See* 139 Cong. rec. H 505, 516.

32.     During the floor debate over the NVRA in the House of Representatives, Representative Bonior of Michigan stated that the NVRA was meant to remove antiquated and unnecessary obstacles in voter registration. *See* 139 Cong. rec. H 507.

33.     The House Committee stated in House Report 103-9 indicates that NVRA Subsection (a) requires that all States accept and use the mail voter registration form prescribed by the Federal Election Commission. In addition, States are permitted to develop and use their own mail registration form, provided it meets the requirements of this Act. Mail registration forms may also be used for voter registration change of address. *See* H.R. Rep. No. 103-9.

34.     The House Committee stated in House Report 103-9 indicates that Subsection (b) of the NVRA requires the chief State election official to make the mail

registration forms available for distribution through governmental and private entities, with a particular emphasis on making such forms available to organized voter registration programs. Broad dissemination of mail application forms, when coupled with the other procedures of this bill, should reach most persons eligible to register to vote, and is, therefore, a key element of the voter outreach feature of this bill. Such forms may also be disseminated to agencies designated under the agency-based registration procedures for use by those agencies in their registration programs. *See* H.R. Rep. No. 103-9.

35. The House Committee stated in House Report 103-9 indicates that Subsection (b) of the NVRA sets forth the requirements of the mail registration form to be developed by the FEC and that the form may only require such identifying information (including the signature of the applicant) and other information (including data relating to previous registrations) as is necessary to enable the appropriate State election official to assess the applicants eligibility. *See* H.R. Rep. No. 103-9.

36. The federal regulations require states to accept, use, and make available national mail voter registration form. 11 CFR. § 8.3.

37. Federal regulations require the national mail voter registration form to include: the last, first, and middle name of the applicant; address where the applicant lives, mailing address if different from the address where the applicant lives; the month, day, and year of birth; and a voter identification number as required or requested by the applicant's state of residence for election administration purposes. 11 CFR. § 8.4.

38. The federal regulations do not require any documentation, including a citizenship document, be submitted in support of the national mail voter registration form. The federal regulations require that the application include a field for the signature of the applicant, under penalty of perjury, and the date of the applicant's signature. The federal regulations require that the form notify an applicant of the penalties provided by law for submitting a false voter registration application. 11 CFR. § 8.4.

39. The federal regulations require that the application be a 5 inch by 8 inch in size and of sufficient stock and weight to satisfy postal regulations. In addition, the application card shall be attached by a perforated fold to another 5 inch by 8 inch card and the application card must be able to be sealed. 11 CFR. § 8.5.

40. The FEC in 11 C.F.R § 8.2(a) defined "form" for the federal registration application to include only the registration application, accompanying general instructions for completing the form, and state-specific instructions. The only items that the FEC designated as necessary to assess the eligibility of the applicant or to administer voter registration were: the applicant's name; the inclusion of an area for designating a suffix to the name; the former name, where applicable; a residential or mailing address; a former address, where applicable; and date of birth. 11 C.F.R. § 8.4(a)(1)-(4); 59 F.R. 32311-01(I)(A)-(H).

41. In 11 C.F.R. § 8.2(a), the FEC excluded certain items from the form because they did not meet the "necessary threshold" of the NVRA to assess the eligibility of the applicant or to administer voter registration. The FEC found that

information regarding naturalization and place of birth was unnecessary. 59 F.R. 32311-01(II)(A)- (K).

42. The FEC mandated that states "accept, use, and make available" the form described in 11 C.F. R. § 8.3. 11 C.F. R. § 8.3(c).

43. In 11 C.F.R. § 8.5(c)(1), the FEC states that the form should be self-sealable so that it remains in-tact through the mail. 59 F.R. 32311-01 (III)(A).

44. In considering reproduction methods for the forms, the FEC expressed concern that a photocopied application would be too flimsy to send through the mail. 59 F.R. 32311-01 (III)(F). The FEC recognized that a photocopied form could be mailed in an envelope or delivered by hand, but expressed reluctance to create additional burdens on those applicants who were forced to do so. 59 F.R. 32311-01 (III)(B).

45. The Senate Minority report states that the NVRA prohibits citizenship verification voter registration schemes. Opponents of the NVRA cited its failure to require and its prohibition against citizenship verification as a basis for opposition. *See* S. Rep. 103-6, at 55 ("[Non-citizen voting] fraud might be combated by requiring proof of citizenship at the time of registration. However, mail registration under this bill would preclude such corrective action.").

46. The Congressional records for a previous version of the NVRA, which was not signed into law, reveal that the lack of citizenship verification was a major source of contention and generated substantial opposition- based primarily on fears of voter fraud- from both Houses and the Department of Justice. *See* S. Rep. 102-60, at

40, 62 (1991); S. Rep. 103-6, at 53, 55.  President Bush agreed and vetoed the bill, believing that it "would expose the election process to an unacceptable risk of fraud and corruption." 138 Cong. Rec. S9772.

47.     When the bill that would become the NVRA was reintroduced in 1993, the debate over citizenship verification continued. *See, e.g.,* 139 Cong. Rec. H505, H506 (daily ed. Feb. 4, 1993), H510.

48.     Amendments eliminating the mail registration component, demanding states to certify that they have fraud prevention measures in place, and the addition of statements which discouraged non-citizens from registering were ultimately defeated. *See* 139 Cong. Rec. H505, H528; 139 Cong. Rec. H288, H295 (daily ed. Jan 27, 1993).

49.     The Senate passed an amendment which read, "Nothing in this Act shall be construed to preclude a State from requiring presentation of documentary evidence of the citizenship of an applicant for voter registration." 139 Cong. Rec. S2897, S2901 (daily ed. March 16, 1993).

50.     The conference committee rejected the Senate amendment allowing states to require documentary proof of citizenship, stating, "[i]t is not necessary or consistent with the purposes of [the NVRA]." H. Rep. 103-66, at 23-24 (1993).

51.     The Senate amendment allowing States to require documentary proof of citizenship was the only amendment completely rejected in the conference committee. H. Rep. 103-66, at 23-24 (1993).

**III. PROPOSITION 200**

52. On December 12, 2005, the Arizona Secretary of State's office contacted the EAC and asked the Commission to include the state's documentary proof of citizenship requirement in the instructions to voter registration applicants using the federal registration application. *See* Perales Decl. Ex. E.

53. In a letter dated March 6, 2006, the EAC's Executive Director Thomas Wilkey explained that Proposition 200's documentary proof of citizenship requirement does "not alter the state's voter qualifications… [it] is merely an additional means to document or prove the existing voter eligibility requirement of citizenship." Thus, Proposition 200's proof of citizenship requirements "deal with the manner in which registration is conducted and are, therefore, preempted by Federal law." *See Id.*

54. The March 6, 2006 letter stated that Arizona "may not mandate additional registration procedures that condition the acceptance of the Federal Form" on the applicant's production of additional documentary proof of citizenship. The letter also explained that the NVRA was a proper exercise of that power, and the Act requires that States accept and use the Federal Form created by the EAC. The letter also stated that the Federal Form's "checkbox" for citizenship, along with the applicant's attestation and signature under penalty of perjury, is the verification method Congress has chosen to register voters for federal elections, and a state is preempted from imposing additional requirements for acceptance of the Federal Form. The letter went on to state that while the State had the authority to determine voter and voter registrant qualifications for state elections, Arizona must comply with federal regulations with regard to federal elections. *See Id.*

55.     In a letter dated March 13, 2006, Secretary of State Jan Brewer responded to the March 6, 2006 letter from the EAC.  In her letter, Secretary of State Brewer stated that she disagreed with the EAC's position that Proposition 200's proof of citizenship requirements were preempted by federal law and therefore must not be made a condition for voter registration.   The letter also stated that she would instruct Arizona's country recorders to enforce the requirements of Proposition 200 for all voter applicants, and again urged the EAC to instruct Arizona applicants using the Federal Form to provide documentary proof of citizenship as required by Proposition 200. *See Id.*

56.     In a letter dated June 20, 2006, Secretary of State Brewer requested the EAC to incorporate Arizona's documentary proof of citizenship requirements in the instructions to the Federal Form. *See Id.*

57.     On July 11, 2006 the EAC held a tally vote on the question whether to include Arizona's documentary proof of citizenship requirements in the instructions to the Federal Form.  The measure failed. *See Id.* at Ex. J.

58.     The State did not describe anywhere in its preclearance submission that it would abandon its practice of accepting the Federal Voter Registration Form and made no mention of the NVRA.  Instead, the State only described its planned changes to state law and state voter registration procedures. *See* Dkt. No. 282, Attach. 1.

59.     Proposition 200 has resulted in close to 30,000 rejected voter registration applications because they did not include documentary proof of citizenship. Dkt. No.283, attachment 1 at Ex. I-M.

60. Patty Hansen, the Elections Administrator for Coconino County, testified that if an individual or organization wanted an actual federal voter registration form, they would be referred to the Secretary of State's Office or the Elections Assistance Commission. Hansen Dep. at 36:6-10.

61. Joseph Kanefield, State of Arizona Elections Director, testified that the Secretary of State has a policy of requiring county recorders to reject federal mail voter registration applications that are not accompanied by satisfactory proof of citizenship. Kanefield Dep. at 80:20-81:24.

62. Joseph Kanefield testified that he did not know if the federal voter registration form was available at the Motor Vehicle Division. Kanefield Dep. at 147:18-148:19.

63. Joseph Kanefield testified that he did not know if the federal voter registration form was available at state agencies. Kanefield Dep. at 148:15-18.

64. Joseph Kanefield testified that he did not know if the federal form was available at offices that provide public assistance in Arizona. Kanefield Dep. at 149:13-16.

65. Joseph Kanefield testified that at the Secretary of State's office both the federal and state registration forms are available. He also testified that at the Secretary of State's office the federal forms are not displayed where individuals can take them without specifically asking for the federal form. Kanefield Dep. at 149: 17-23.

66.     Karen Osborne, the Maricopa County Elections Director, testified that the Maricopa County Elections Department does not have federal mail voter registration forms available in the office.  Osborne Dep. at 42:22-24.

67.     Karen Osborne testified that when voter registration organizations request voter registration forms from Maricopa County, they are provided only with Arizona forms.  Osborne Dep. at 43:2-11.

68.     Karen Osborne testified that she believes that United States citizens living in Maricopa County who are eligible to register to vote have been unable to do so since Proposition 200 went into effect because they lack the necessary documents.  Osborne Dep. at 43:12-17.

69.     Karen Osborne testified that in at least one instance Maricopa County has turned away eligible voters who attempted to register but lacked the necessary documents required by Proposition 200.  Osborne Dep. at 43:21-44:9.

70.     Karen Osborne testified that she believes the attestation section of the registration form adequate to ensure that qualified persons were registering to vote.  Osborne Dep. at 105:3-6.

71.     F. Ann Rodriguez, Pima County Recorder, testified that voter registration applicants whose applications are insufficient because they fail to provide materials required by Proposition 200 will not be added to the voter rolls until they provide the mandated materials.  Rodriguez Dep. at 23:16-22.

72.     F. Ann Rodriguez testified that she could not recall any written guidance from the state of Arizona on how to implement the proof of citizenship requirements of

Proposition 200.  Rodriguez Dep. at 34:13-34:17.

73.     F. Ann Rodriguez testified that she does not recall the Secretary of State for Arizona ever asking or instructing her to distribute or make available the federal mail voter registration applications. Rodriguez Depo at 84:1-6.

74.     F. Ann Rodriguez testified that she knows that potential registrants are not submitting voter registration applications because they lack the necessary documents. Ms. Rodriguez used the example of her mother who was born in New Mexico as an example of the hardships some individuals may have in obtaining the necessary documentation in order to register to vote.  Rodriguez Depo at 88:23-89:20.

75.     Luciano Valencia, a United States Citizen who meets all of the requirements to vote in Arizona, testified that he presented a completed federal registration application prescribed by the U.S. Election Assistance Commission to a clerk at the Pima County Recorder's Office.  Mr. Valencia testified that the Clerk stated that his application would not be processed because his application did not include proof of citizenship.  *See* Prelim. Inj. Hr'g. Ex. 217; Valencia Decl. at 1, July 25, 2006.

76.     Lydia Camarillo, Vice President of the Southwest Voter Registration Education Project (SVREP), a non-profit and non-partisan organization committed to improving the participation of Latino and other minority communities across the United States in the democratic process through among other things voter registration drives, testified that Proposition 200's proof of citizenship requirements for voter registration will severely impair the ability of SVREP to register voters in Arizona

because it requires canvassers to bring along photocopy machines or scanners and printers to places where voters gather, or to bring such a machine door-to-door in a neighborhood. Ms. Camarillo also testified that SVREP may not have the resources to purchase this equipment, and even if they could purchase the necessary equipment, voter registration applicants are unlikely to allow a canvasser to copy citizenship documents. *See* Prelim. Inj. Hr'g. Ex. 218 Camarillo Decl. at 3-4, July 25, 2006.

77.    Ms. Camarillo testified that Proposition 200's proof of citizenship requirements for voter registration will severely impair the ability of SVREP to register voters by requiring all canvassers to bring along photocopy machines or scanners and printers to places where voters gather, or to bring such a machine door-to-door in a neighborhood. *See Id.* at 4.

DATED this 12th day of July, 2007.    Respectfully submitted,

By: ___ /s/Nina Perales
Nina Perales

Counsel for Plaintiffs
Gonzalez, et al.

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of July, 2007, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants.

1    COPY of the foregoing filed electronically
2    this 12th day of July, 2007.

3    COPY of the foregoing mailed with Notice
4    of Electronic Filing this 12th day of July, 2007 to:

5    The Honorable Roslyn O. Silver
     United States District Court
6    Sandra Day O'Connor U.S. Courthouse, Suite 624
     401 West Washington Street, SPC 59
7    Phoenix, AZ 85003-2158

8

9                                 /s/Nina Perales
                                  Nina Perales